UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

-vs-                             Case No.  5:12-cv-167-Oc-10TBS

OCALA LIVE STOCK MARKET, INC.,
MICHAEL YEOMANS, and TOBITHA
YEOMANS,

          Defendants.
_____

## ORDER GRANTING PLAINTIFF'S DISPOSITIVE MOTION FOR PRELIMINARY INJUNCTION AND PRELIMINARY INJUNCTION

The Packers and Stockyards Act regulates the conduct of packers, swine dealers, live poultry dealers, stockyard owners, market agencies, and dealers.  7 U.S.C. §§ 181-229c.  Under the Act, all market agencies[1] are prohibited from operating while insolvent (defined under the Act as occurring when current liabilities exceed current assets).  See 7 U.S.C. §204, 9 C.F.R. § 203.10.  In addition, the Secretary of Agriculture has promulgated regulations that require market agencies to deposit all proceeds from the sale of consigned livestock into a separate bank account designated as a "Custodial Account for Shippers' Proceeds."  See 9 C.F.R. § 201.42.  Custodial account funds cannot be mingled with other operating funds, and withdrawals are permitted from the custodial account only to remit the

---

[1]A "market agency" is "any person engaged in the business of (1) buying or selling in commerce livestock on a commission basis or (2) furnishing stockyard services."  7 U.S.C. §201(c).

net proceeds due to a consignor or to pay other lawful marketing charges. See 9 C.F.R. § 201.42; Cobb v. Yeutter, 889 F.2d 724, 729-30 (6th Cir. 1989). The market agency is further obligated to ensure that the custodial account is never overdrawn, and is always in balance. See 9 C.F.R. § 201.42.

The United States of America, on behalf of the Secretary of Agriculture, has filed a Complaint for declaratory and injunctive relief against the Defendants, a market agency and its joint owners, alleging that they have repeatedly operated while insolvent, and have violated several of the Act's implementing regulations concerning the handling of their custodial account (Doc. 1). The United States seeks a preliminary injunction against the Defendants enjoining them from all operations until various administrative proceedings are concluded (Doc. 2).

The Defendants filed an answer to the Complaint (Doc. 15), and the Court heard argument on the motion for preliminary injunction on April 19, 2012 (Doc. 16). The Court has reviewed the Parties' submissions, including their supplemental briefs and the United States proposed injunction (Docs. 17-18, 21), and has considered the Parties' arguments.

The Court concludes that the motion for preliminary injunctive relief shall be granted.

### Background

The facts, as set forth in the United States' Complaint, attached declarations, and submitted documentation, are as follows. (Docs. 1, 2-1, 21-2). Defendant Ocala Livestock Market, Inc., ("Ocala Livestock") is a corporation located in Ocala, Florida operating as a

market agency which sells livestock in commerce on a commission basis. Defendants Tony and Tobitha Yeomans are the corporate officers and joint owners of Ocala Livestock, and are the persons responsible for the direction, management, and control of the company. All of the Defendants are subject to the provisions of the Packers and Stockyard Act and its implementing regulations.

On April 3, 2010, Ocala Livestock filed with the Secretary its 2009 Annual Report of Dealer or Market Agency Selling on Commission. In the 2009 Annual Report, Ocala Livestock reported a custodial account shortage of $69,516.30 as of December 31, 2009, and also reported that its current liabilities exceeded its current assets by $144,313.14. Based on this disclosure, the Eastern Regional Office of the Packers and Stockyards Program, Grain Inspection, Packers and Stockyards Administration ("GIPSA") sent a Notice of Violation letter to Ocala Livestock and requested that the Defendants file a Special Report by August 31, 2010.[2]

On August 19, 2010 GIPSA received Ocala Livestock's Supplemental Balance Sheet Special Report, which disclosed that Ocala Livestock's current liabilities exceeded its current assets by $29,346.00 as of July 30, 2010. GIPSA later received Ocala Livestock's

---

[2]Apparently Ocala Livestock has had issues concerning its solvency and shortages in its custodial account for some time. GIPSA sent two other Notice of Violation letters to Ocala Livestock on November 14, 2005 and June 6, 2007, and also sent the Yeomans letters informing them how the custodial account should be maintained on November 16, 2005, June 13, 2007, August 22, 2008, July 18, 2011, and October 4, 2011. GIPSA also sent similar letters to Florida Citizens Bank on June 13, 2007, August 26, 2008, July 18, 2011, and October 4, 2011. See Second Declaration of Karen Collins, ¶¶ 3-4, and Exs. A-C (Doc. 21-2).

Status of Custodial Bank Account of Shippers' Proceeds Special Report, which showed an overage of $967.53 in the custodial account as of July 30, 2010.

Based on the information in these Special Reports, Karen Collins, a senior auditor with GIPSA in Atlanta, Georgia, conducted an onsite investigation of the status of Ocala Livestock's custodial account and its financial condition during the weeks of October 4, 2010 and October 18, 2010. Ms. Collins reviewed bank account records, bank statements, outstanding check lists, deposit slips, copies of cancelled checks, purchase and sales invoices, accounts receivable lists, sales summaries, accounts payable, notes payable, and line of credit history. Ms. Collins' investigation showed that as of July 30, 2010, Ocala Livestock's custodial account actually had a shortage of $23,673.74, and that current liabilities exceeded current assets by $298,106.39. The investigation further showed that as of October 4, 2010, the custodial account had a shortage of $216,608.02, and Ocala Livestock was insolvent by $302,433.31. Ms. Collins also discovered that the Defendants were misusing custodial account funds to make payments on Ocala Livestock's line of credit.[3]

Ocala Livestock's 2010 Annual Report of Dealer or Market Agency Selling on Commission listed a custodial account shortage of $18,539.46 and an insolvency of

---

[3]Ms. Collins stated that she spoke with the Yeomans, who represented that they would always be insolvent, and could not deposit sufficient funds into the custodial account to correct the shortage. First Declaration of Karen Collins, ¶ 6 (Doc. 2-1, p. 3).

$151,687.80 as of December 31, 2010.[4]  On July 14, 2011, the Eastern Regional Office received Ocala Livestock's Status of Custodial Bank Account for Shippers' Proceeds Special Report, in which Ocala Livestock self-reported a custodial account overage of $209.67 as of May 31, 2011.  GIPSA, however, subsequently determined that the custodial account actually had a shortage of $17,452.75 as of May 31, 2011.[5]

On September 14, 2011, Nilsa Ramos Taylor, a Resident Agent with GIPSA, received an anonymous phone call that Ocala Livestock had issued the caller a check that could not be cashed due to insufficient funds.[6]  Based on this anonymous tip, Ms. Collins and another GIPSA auditor, Erica Nelson, conducted a follow up investigation of Ocala Livestock from September 19-30, 2011.  The auditors reviewed the same categories of documentation that Ms. Collins reviewed in her first investigation, this time focusing on the time period February 1, 2011 through October 4, 2011.  The investigation determined that as of September 21, 2011:  (1) Ocala Livestock's current liabilities exceeded its current

---

[4]GIPSA determined that the insolvency was actually $170,227.26 as of December 31 2010. The difference in calculations was due to the Defendants' failure to include the custodial account shortage as a current liability.  First Declaration of Karen Collins, ¶ 7 (Doc. 2-1, p. 3).

[5]Apparently the Defendants had included accounts receivable in the custodial account, which GIPSA does not.  First Declaration of Karen Colllins, ¶ 8 (Doc. 2-1, p. 3).  GIPSA transfers proceeds receivable into accounts receivable (and removes them from the custodial account balance) when they have not been paid by the close of the seventh business day after the sale of the livestock.  Id.

[6]The anonymous caller was eventually paid at an unknown later date.  It is not specified whether the caller was a consignor of livestock, however, Defendants' counsel represented at oral argument (without any evidentiary support) that the check came from Ocala Livestock's operating account.

assets by $357,951.08; (2) Ocala Livestock was operating with a custodial account shortage of $86,425.66; and (3) the Defendants were continuing to misuse their custodial account by permitting their bank to withdraw fees for insufficient funds from the account on nine (9) separate occasions, by issuing a check to Tobitha Yeomans out of the account funds, and by using custodial funds to make payments on a line of credit and to pay property taxes.

On October 7, 2011, the Secretary of Agriculture issued an administrative complaint against the Defendants alleging numerous violations of the Act, including: (1) operating while insolvent on two occasions, (2) willfully violating the solvency requirements of 7 U.S.C. § 213(a); (3) willfully failing to properly maintain a custodial account on at least two occasions; and (4) willful misuse of the custodial account by the Yeomans (Doc. 1, Ex. A). The administrative complaint requests that an order be issued requiring the Defendants to cease and desist their violations of the Act and its regulations, suspend the Defendants as registrants under the Act, and assess civil penalties. The administrative proceedings are ongoing, with a hearing set to commence before an Administrative Law Judge on May 22, 2012.[7]

Ocala Livestock claims that it has always been solvent, has never misused its custodial account, and has always operated in accordance with the Act and its regulations.

---

[7]The United States represents that administrative proceedings will continue for an extended period of time, due to post-hearing briefing and, if necessary, an appeals process. (Doc. 2, p. 10). The Defendants, however, represent that the Parties are discussing settlement options, and opine that the case will soon be resolved with a civil penalty (Doc. 18, pp. 2-3).

Instead, the Defendants argue that the purported insolvency claimed by the United States is the result of faulty accounting methodology utilized by GIPSA. The Defendants further claim that every consignor of livestock who has engaged in transactions with Ocala Livestock has received timely payment in full. While the Defendants have not submitted any evidence to support these contentions, the United States has not refuted the claim that all consignors have been timely paid in full.

During oral argument, the Defendants acknowledged that they obtained a $240,000 promissory note line of credit with Florida Citizens' Bank in Ocala, Florida on June 25, 2010, as well as an $80,000 bond, which the Defendants argue are used to ensure their solvency and to prevent any shortages in the custodial account.[8] The Defendants' line of credit operates solely as a "sweep account" to fill in any temporary shortages in the custodial account, and to ensure timely and full payment to all consignors of livestock. Typically, according to the Defendants, a few days pass between payment to a consignor from the custodial account and receipt by the Defendants of funds from the buyer (and the buyer's check clears), and it is during this "gap period" that the line of credit fills in the shortage.[9] When the Defendants receive proceeds from the sale of consigned livestock,

---

[8]The Packers and Stockyard Act requires market agencies to maintain a surety bond in the event that the agency is unable to remit to the consignors the net proceeds due to them from their sale of their livestock. The bond is required to be in an amount sufficient to cover all potential consignor claims, but there is no specific dollar amount identified in the Act or its regulations. Pursuant to 9 C.F.R. § 203.10, Ocala Livestock's bond cannot be counted as a current asset for insolvency purposes because it is not expected to be liquidated into cash within one year.

[9]The Act requires market agencies to issue a custodial check to the consignor of the
(continued...)

the bank transfers the funds from the custodial account back into the line of credit. By using this method, if a person were to take a "snapshot" of the custodial account balance at the end of the day, it might show a shortage which the line of credit would cover overnight, resulting in a positive balance in the custodial account by noon the next day.

The Defendants secured the line of credit with two certificates of deposit totaling $240,000, and the Defendants further claim the United States improperly failed to take the certificates of deposit into account as a current asset when assessing Ocala Livestock's solvency. However, the United States represents that it would not and cannot take the certificates of deposit into consideration with respect to Ocala Livestock's insolvency, because the certificates of deposit are personal assets of the Yeomans (one is in the name of Tony Yeoman and the other in the name of Tobitha Yeoman) and are not owned by Ocala Livestock. As such, they could not be considered current assets of the company. In addition, GIPSA included the full amount of the line of credit in its calculation of Ocala Livestock's current liabilities as of July 30, 2010, because at that time Ocala Livestock had borrowed the full amount of the promissory note – thereby making the entire amount due and payable.[10] See Second Declaration of Karen Collins, ¶ 10 (Doc. 21-2).

---

[9](...continued)
livestock before the close of the next business day following the sale of the livestock.

[10]Similarly, GIPSA included the outstanding balance on the promissory note of $153,000 in its calculation of Ocala Livestock's current liabilities as of October 4, 2010 because that was the amount due and owing on the note. GIPSA did not include the unused portion of the line of credit as a current asset because Ocala Livestock did not actually have the cash at hand – the company would have had to borrow the cash from the line of credit (which would have merely increased
(continued...)

The Defendants also addressed at oral argument several identified "misuses" of the custodial account. The Defendants contend that two livestock purchasers tried to pay for consigned cattle with bad checks that "bounced," and that the Yeomans covered the resulting shortage in the custodial account with their own personal funds. Once the Yeomans were able to recover monies from the purchasers, the Yeomans issued checks out of the custodial accounts to themselves as reimbursement. The Defendants further claim that the payment of property taxes out of the custodial account was a mistake by their bank, which was quickly rectified by returning those funds to the custodial account and debiting Ocala Livestock's operating account instead.[11]

## Discussion

### I.   Preliminary Injunctive Relief Under the Packers and Stockyards Act

Under 7 U.S.C. § 228a of the Act, the Secretary of Agriculture has the authority to request the Attorney General to apply to a United States district court for a temporary injunction or restraining order when the Secretary of Agriculture has reason to believe (among other things) that:  (a) a market agency has operated while insolvent, or otherwise in violation of the Packers and Stockyard Act and/or regulations, and in a manner which

---

[10](...continued)
current liabilities). See Second Declaration of Karen Collins, ¶¶ 10-11 (Doc. 21-2). As of August 24, 2011, Ocala Livestock had again borrowed the entire amount of the line of credit, and as of September 21, 2011, Ocala Livestock had outstanding checks of $249,372.99. Id. ¶ 15.

[11] The Defendants submitted a letter from the bank supporting their claim concerning the property taxes payment (Doc. 15, Ex. A).

may reasonably be expected to cause irreparable damage to another person; and (b) that it would be in the public interest to enjoin the market agency from operating "until a complaint under this Act is issued and dismissed by the Secretary or until an order to cease and desist made thereon by the Secretary has become final and effective." The statute directs the Court to issue a temporary injunction or restraining order, without bond, if such a showing is made.

Because § 228a specifically authorizes injunctive relief, *i.e.*, a "statutory injunction," the Court need not engage in the traditional four factor analysis applied to requests for injunctions. As the Court of Appeals noted in <u>Klay v. United Healthgroup, Inc.</u>, 376 F.3d 1092 (11th Cir. 2004):

> A statutory injunction is available where a statute bans certain conduct or establishes certain rights, then specifies that a court may grant an injunction to enforce the statute. Because Congress has the power to determine the scope of statutory rights, the proper remedies for statutory violations, and the circumstances under which those remedies should be available, the standards for granting statutorily-authorized injunctions are necessarily controlled by the statute itself.

376 F.3d at 1098. <u>See</u> <u>also</u> <u>CFTC v. Muller</u>, 570 F.2d 1296, 1300 (5th Cir. 1978) ("In actions for a statutory injunction, the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunction suits. A prima facie case of illegality is sufficient.");[12] <u>cf.</u> <u>United States v. American Therapeutic Corp.</u>, 797 F. Supp.

---

[12]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir 1981) (en banc), the Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down
(continued...)

2d 1289, 1291 (S.D. Fla. 2011).  Thus, in this case, the Court should grant injunctive relief if it finds that the United States has satisfied the requirements of § 228a.  The Court finds that the United States has met its burden.  The Court also finds, in any event, that the United States has also met the usual criteria justifying injunctive relief.  <u>See</u> infra, page 18 *et seq.*

## A.    Operating While Insolvent and/or In Violation of the Act.

The United States has presented evidence in the form of declarations from GIPSA auditors, as well as Ocala Livestock's own reports, establishing that at various points in time in 2009, 2010, and 2011, Ocala Livestock's current liabilities far exceeded its current assets.[13]  <u>See</u> First and Second Declarations of Karen Collins and attached exhibits (Docs. 2-1, 21-1).  This is the sine qua non of insolvency under the Act.  <u>See</u> 9 C.F.R. § 203.10(a) ("Under the Packers and Stockyards Act, 1921, . . . the principal test of insolvency is to determine whether a person's current liabilities exceed his current assets.").  <u>See</u> <u>also</u> <u>Bowman v. United States Dept. of Agriculture</u>, 363 F.2d 81, 85 (5th Cir. 1966).

_____

[12](...continued)
prior to October 1, 1981.

[13]The regulations further define "current assets" as "cash and other assets or resources commonly identified as those which are reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the business, which is considered to be one year." 9 C.F.R. § 203.10(b)(1).  "Current liabilities" are defined as "obligations whose liquidation is reasonably expected to require the use of existing resources principally classifiable as current assets or the creation of other current liabilities during the one year operating cycle of the business."  9 C.F.R. § 203.10(b)(2).  Custodial account funds are specifically excluded from the definition of "current assets."  9 C.F.R. § 203.10(d).

The Defendants dispute any findings of insolvency, primarily by arguing that GIPSA failed to take into account the certificates of deposit which secure Ocala Livestock's $240,000 line of credit as "current assets." However, the United States has presented evidence explaining why the certificates of deposit cannot be treated as current assets. First, they are owned in the individual names of Tony and Tobitha Yeomans, and therefore cannot be treated as an asset of the company. Second, and more persuasive, is the fact that these certificates of deposit are not "reasonably expected to be realized in cash or sold or consumed during . . . one year." See 9 C.F.R. § 203.10(b)(1). See also 9 C.F.R. §203.10(d) (excluding from the definition of "current assets" "investments in securities (whether marketable or not) or advances which have been made for the purposes of control, affiliation, or continuing business advantage."). By Ocala Livestock's own admission, these certificates of deposit are intended as collateral for the company's line of credit – and Ocala Livestock has not submitted any evidence suggesting that the certificates of deposit will be sold or realized as cash within one year.[14] Absent the inclusion of the $240,000 in certificates of deposit as current assets, there can be no doubt that Ocala Livestock has repeatedly operated while insolvent.[15]

---

[14]The Court is aware that the certificates of deposit are issued for 12 month periods. However, it is clear that the Defendants have renewed the certificates each year. For example, the certificate of deposit issued in the names of Tony and Tobitha Yeomans for $150,000, was first issued in February 14, 2008, and remains as collateral for the line of credit today. See First Declaration of Karen Collins Ex. C, pp. 12-13 (Doc. 2-1).

[15]The Defendants have also argued that there has been no showing of a "current insolvency." However, as the United States correctly states, § 228a of the Act does not require
(continued...)

The Court further finds that it is likely that this insolvency will continue in the future. GIPSA auditor Karen Collins has stated under penalty of perjury, that the Yeomans have acknowledged Ocala Livestock's insolvent status, and informed Ms. Collins that the insolvency will not change. See First Declaration of Karen Collins, ¶ 6 (Doc. 2-1). The Defendants have not refuted this statement. Moreover, Ocala Livestock has self reported insolvencies on each of its reports to GIPSA in 2010 and 2011, and the Defendants have not submitted any evidence suggesting that the company will change any of its procedures so that it can operate in a solvent status in the future.[16]

The United States has also made a sufficient showing that the Defendants have violated other provisions of the Act and its regulations – specifically the requirements

---

[15](...continued)
a showing that the market agency is insolvent as of today, but rather requires a showing that the Secretary of Agriculture has reason to believe that a market agency "has operated while insolvent."

[16]The Court is aware of various accountant reports attached to the Defendants' Motion to Stay Ruling on Preliminary Injunction (Doc. 22-1), which the Defendants contend show that Ocala Livestock is presently operating in a solvent status, and without any custodial account shortages. As discussed above, the test for issuing an injunction under § 228a does not require a showing of currently insolvency – but rather that such insolvencies have occurred, and that there is a risk of irreparable harm – and the United States has met this standard. In addition, the Court has serious concerns regarding the accuracy of these documents. The cover page authored by the Defendant's independent accountants clearly states that the accountants "have not audited or reviewed the special reports . . . and, accordingly, do not express an opinion or provide any assurance about whether the special reports are in accordance with accounting principles generally accepted in the United States of America." (Doc. 22-1, p. 1). The United States has also submitted the Declaration of Supervisory Auditor Robert L. Schmidt, which states that these new reports do not have sufficient supporting documentation, and appear to have numerous errors which, when corrected, establish that Ocala Livestock continues to operate while insolvent and with custodial account shortages. See Declaration of Robert L. Schmidt, ¶¶ 3-4 (Doc. 21-4). The Court does not find these reports persuasive and will give them no further consideration.

concerning maintenance of Ocala Livestock's custodial account. The United States has presented evidence showing repeated shortages in the custodial account, including nine (9) occasions in the Fall of 2011 where Florida Citizens' Bank charged overdraft fees to the account. The United States has also presented unrefuted evidence that on at least two (2) occasions checks were withdrawn from the custodial account to reimburse Ms. Yeoman and to pay Ocala Livestock's property taxes – both of which are impermissible uses of custodial account funds. See 9 C.F.R. § 201.42; Cobb v. Yeutter, 889 F.2d 724, 729-30 (6th Cir. 1989).

The Defendants point to their $240,000 line of credit as proof that the custodial account has never had a negative balance. Once again, the Defendants own reports belie this claim. The Defendants have self reported shortages in the custodial account on at least one occasion, even with the line of credit in operation. See First Declaration of Karen Collins, Ex. B. Moreover, as the Defendants acknowledged at the April 19 hearing, at various points during the day the custodial account will have shortages, which are not covered until the line of credit "sweeps" the account overnight. Thus, while it may be that the shortages are of a temporary nature, shortages have frequently occurred, and will continue to do so – thereby violating the Act. And while the Defendants argue that using a line of credit to cover any custodial account shortages is accepted practice, at least two circuit courts have held otherwise.

> [The Plaintiff] also attempts to assert that the fact he possessed a letter of credit, which could have been used to pay consignors in the event of loss, militates against a finding of liability. We

disagree.  First, consignors should not have to be involved in the business of ensuring that their consignees have valid, irrevocable, sufficient letters of credit.  Second, custodial accounts receive greatly increased insurance protection of up to $100,000 per individual trustee, and this protection is unavailable if the consignees are protected in any way other than by deposits into their custodial account.  A line of credit is not to be considered in determining whether a custodial account is in balance.  Arab Stock Yard, Inc., 37 Agric. Dec. 293, aff'd, 582 F.2d 39 (5th Cir. 1978).

Cobb, 889 F.2d at 730, n. 3.

Lastly, the Defendants have presented several explanations for the misuse of the custodial account funds – bounced checks by buyers, and mistakes by the bank.  The Packers and Stockyards Act is a strict liability statute.  See Cobb, 889 F.2d at 730.  The fact that the violations may not have been undertaken with an improper motive, and/or may have been the fault of third parties, does not change the analysis.

**B.      Reasonably Expected to Cause Irreparable Damage.**

The Court further finds that there is sufficient evidence that the Secretary of Agriculture has reason to believe that the Defendants were operating Ocala Livestock in a manner "which may reasonably be expected to cause irreparable damage to another person."  7 U.S.C. § 228a.  "When selling as a consignee at an auction, a market agency is acting in a fiduciary capacity on behalf of all shippers who have consigned livestock." Cobb, 889 F.2d at 729-30.  By operating while insolvent and allowing custodial shortages (regardless of brief duration), Ocala Livestock effectively breached its fiduciary duties and impermissibly placed the risks of payment on the consignors.  Id.  In such circumstances,

it "may reasonably be expected" that irreparable harm will follow.  Ocala Livestock's line of credit and apparent overdraft protection are not sufficient to alleviate these ricks.  See Cobb, 889 F.2d at 730, n. 3; In re Jeff Palmer, 50 Agric. Dec. 1762, 1773-73, 1778, 1991 WL 337381 (July 18, 1991) (holding that overdraft protection is not an adequate defense to an account shortage).

Ocala Livestock points to the fact that every consignor who transacted with Ocala Livestock received timely payment.  This point, while unrefuted, is not relevant – the violation of the Act and/or its regulations itself creates the irreparable harm.  Cobb, 889 F.2d at 730 ("It is thus irrelevant that, as Cobb frequently points out, no consignors have ever lost money and his custodial account balance never dipped below zero.").  Simply put, the Defendants violated the Act and its regulations, and that is enough.[17]

Moreover, the purpose of the Act itself dictates that the Court should not wait for an actual injury before exercising its authority under § 228a, .  See Bowman, 363 F.2d at 85 ("[T]he Act is designed to '. . . prevent potential injury by stopping unlawful practices in their incipiency.  Proof of a particular injury is not required.'") (quoting Daniels v. United States, 242 F.2d 39, 42 (7th Cir. 1957)).

---

[17]There is evidence in the record which could be interpreted to show willful misconduct on the part of the Defendants.  The Defendants were notified numerous times, dating as far back as 2005, that they were operating in a manner that violated the Act.  However, the Defendants have continued to operate from an insolvent status.  Cobb, 889 F.2d at 730 ("the acts committed are deemed to have been willful, irrespective of evil motive, when the actor intentionally does something that is prohibited.") (citing Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 187, 93 S.Ct. 1455, 1458 (1973)).

**C.    Injunctive Relief Is In the Public Interest**.

The United States has also met its burden of establishing that an injunction would be in the public interest.  The United States points to the "significant" amount of the insolvencies Ocala Livestock has operated under during the past several years, and argues that such insolvencies create a very high risk that those who consign livestock with the market agency will receive inadequate or no payment in the near future.  The United States has also submitted evidence suggesting that Ocala Livestock's liabilities are continuing to grow, its line of credit is fully extended, and its sales are dropping, thereby only increasing the risk of harm to consignors in the future.

The Defendants in turn argue that if an injunction were to issue, the harm to the public would far outweigh any potential risks asserted by the United States.  Specifically, (but without any evidentiary support), the Defendants contend that if Ocala Livestock is shut down, cattle farmers who depend on the market agency to sell their cattle would be forced to drive unreasonably long distances to sell their livestock, necessarily incurring additional fuel and other transportation costs, which would in turn reduce the farmers' already small profit margins. In addition, Ocala Livestock's employees would not be paid for the duration of the injunction, further harming the local economy.

The United States has submitted the Declaration of GIPSA Resident Agent Nilson Ramos Taylor (Doc. 21-3), which states that there are nine large auction markets in Florida, including Ocala Livestock, with auctions held on Mondays, Tuesdays, and

Wednesdays.  The auctions held on Mondays are at Ocala Livestock, in Marion County, Arcadia Stockyards in Arcadia, Florida, Columbia Livestock Market in Lake City, Florida, and Okeechobee Livestock Market in Okeechobee, Florida.  Two other auction markets are located within 80 miles of Ocala Livestock: Sumter County Farmers Market, Inc., located in Webster, Florida, and North Florida Livestock Market, Inc., located in Lake City, Florida. Sumter County holds its auctions on Tuesdays and is less than a 60 minute drive from Ocala Livestock, and North Florida holds its auctions on Wednesdays and is approximately a 90 minute drive from Ocala Livestock.  See Declaration of Nilsa Ramos Taylor ¶¶ 3-5 (Doc. 21-3).

These market agencies – in particular the market agencies in Lake City and Sumter County– are not an unreasonable distance from Marion County such that the harm to the consignors in the form of additional transportation costs outweighs the harm to the public by allowing a market agency with apparently growing insolvencies to continue to operate unfettered.  See also In re: Blackfoot Livestock Commission Co., 45 Agric. Dec. 590, 623, 1986 WL 74695 (Mar. 7, 1986), aff'd, 810 F.2d 916 (9th Cir. 1987) ("[T]he argument as to the hardship to the community resulting from a suspension order has repeatedly been rejected in determining sanctions under the Act.").

The Court therefore finds that the United States has made a sufficient showing under § 228a, and an injunction shall issue.

## II.    Preliminary Injunctive Relief Under Traditional Analysis

While the Court is authorized to grant injunctive relief under § 228a, the Court also finds that injunctive relief is warranted in this case under the traditional equitable criteria applied in this Circuit.  See Klay, 376 F.3d at 1098 (noting that several other cases "suggest that, when Congress authorizes injunctive relief, it implicitly requires that the traditional requirements for an injunction be met in addition to any elements explicitly specified in the statute.").  Cf. United States v. Ernst & Whinney, 735 F.2d 1296, 1301 (11th Cir. 1984).  Under the traditional analysis, "[a] district court may grant injunctive relief only if the moving party shows that:  (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam).

The United States has presented unrefuted evidence that Ocala Livestock has repeatedly operated while its current liabilities exceed its current assets, and has misused its custodial account.  Thus, there is a substantial likelihood of success on the merits of the United States claim under § 228a (which in this case is merely to obtain injunctive relief until all administrative proceedings are completed).  The United States has also made a sufficient showing that irreparable harm will occur to the public – in particular to consignors – who will increasingly bear the risk of non-payment due to Ocala Livestock's continued

and apparently growing insolvency.  See also Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1423 (11th Cir. 1984) ("[I]rreparable injury should be presumed from the very fact that the statute has been violated) (quoting United States v. Hayes International Corp., 415 F.2d 1038, 1045 (5th Cir. 1969)).  Further, this risk of harm outweighs the damage to Ocala Livestock by virtue of ceasing operations for a temporary period of time, particularly where Ocala Livestock has been operating in violation of the Act and its regulations. Lastly, and in accordance with the remedial purposes behind the Act, issuing an injunction will not be adverse to the public interest, but would rather act to protect consignors of livestock.

Having satisfied the traditional equitable approach, the Court finds that a preliminary injunction is necessary and appropriate.

## Conclusion

Accordingly, upon due consideration, the United States' Dispositive Motion for Preliminary Injunction (Doc. 2) is GRANTED.

It is hereby ORDERED and ADJUDGED that Defendants Ocala Livestock Market, Inc., Michael Yeomans, a/k/a Tony Yeomans, and Tobitha Yeomans, their officers, agents, servants, employees, and attorneys, and all other persons and/or entities who are in active concert or participation with such persons, see Fed. R. Civ. P. 65(d)(2), are hereby immediately enjoined and restrained from operating as a market agency until the administrative proceedings before the Department of Agriculture which commenced on

October 7, 2011 are fully and finally resolved, or until such other time that the United States notifies the Court in writing that such injunction should be vacated and dissolved.

The United States shall promptly notify the Court of the completion of the administrative proceedings, and shall report as to whether the preliminary injunction should be vacated or continued in force.

Pursuant to Fed. R. Civ. P. 65(c) and 7 U.S.C. § 228a, the United States is not required to provide a bond for this injunction.

The Defendants' Motion to Stay Ruling on Preliminary Injunction (Doc. 22) is DENIED.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 11th day of May, 2012.

UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record
              Maurya A. McSheehy